**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

_____

UNITED STATES OF AMERICA,

                  Plaintiff-Appellee,

    v.

PAUL CEGLIA,

                  Defendant-Appellant.

_____

Docket No. 15-628

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

**APPELLANT'S RESPONSE TO APPELLEE'S
MOTION TO DISMISS APPEAL**

_____

Gil D. Messina
MESSINA LAW FIRM, P.C.
961 Holmdel Road
Holmdel, NJ 07733
(732) 332-9300

Robert Ross Fogg
LAW OFFICE OF ROBERT ROSS FOGG
69 Delaware Avenue, Suite 600
Buffalo, NY 14202
(716) 853-3644

*Attorneys for Defendant-Appellant,
Paul Ceglia*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.  FACTS IN SUPPORT OF APPELLANT'S RESPONSE
    TO THE GOVERNMENT'S MOTION TO DISMISS. . . . . . . . . . . . . . . . 1

II.  LEGAL ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    A.  The Fugitive Disentitlement Rule May Not be Invoked in
        This Case to Dismiss Ceglia's Interlocutory Appeal. . . . . . . . . . . . 12

    B.  The Order Denying Defendant's Motion to Dismiss
        Because He is Immune From Prosecution Under the
        First Amendment is Immediately Appealable
        Under 28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

III.  CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## <u>TABLE OF AUTHORITES</u>

<u>Cases</u>

*A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.*,
    263 F.3d 239 (3d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988). . . . . . . 18

*BE&K Constr. Co. v. NLRB*, 536 U.S. 516 (2002). . . . . . . . . . . . . . . . . . . . . 17, 19

*Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731 (1983). . . . . . . . . . . . . 16

*California Motor Transport Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Chambers v. Baltimore & Ohio R. Co.*, 207 U.S. 142 (1907). . . . . . . . . . . . . . . 16

*Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119 (3d Cir. 1999). . . . . . . . . . 18

*Cobbledick v. United States*, 309 U.S. 323 (1940). . . . . . . . . . . . . . . . . . . . . . . . 15

*Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949). . . . . . . . . . . . 15

*Coopers & Lybrand v. Livesay,* 437 U.S. 463 (1978). . . . . . . . . . . . . . . . . . . . . . 15

*Degen v. United States*, 517 U.S. 820 (1996). . . . . . . . . . . . . . . . . . . . . . 12, 13, 14

*Eastern Railroad Presidents Conference v. Noerr Motor
    Freight, Inc.*, 365 U.S. 127 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Empire Blue Cross & Blue Shield v. Finkelstein*,
    111 F.3d 278 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Facebook, Inc. v. DLA Piper LLP (US),*
    Index No. 653183/2014 (Sup. Ct. N.Y. County). . . . . . . . . . . . . . . . . . . . 5

*Gulfstream Aerospace Corp. v. Mayacamas Corp.*,
 485 U.S. 271 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Johnson v. Jones*, 515 U.S. 304 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Midland Asphalt Corp. v. United States*, 489 U.S. 794 (1989). . . . . . . . . . . . . . 16

*Ortega-Rodriguez v. United States*, 507 U.S. 234 (1993). . . . . . . . . . . . . . . 12, 13

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
 508 U.S. 49 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Sell v. United States*, 539 U.S. 166 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Sosa v. DirecTV, Inc.*, 437 F.3d 923 (9th Cir. 2006). . . . . . . . . . . . . . . . 18, 19, 21

*United Mine Workers v. Illinois Bar Ass'n*, 389 U.S. 217 (1967). . . . . . . . . . . . 17

*United Mine Workers v. Pennington*, 381 U.S. 657 (1965). . . . . . . . . . . . . . . . 17

*United States v. Anagnos*, 853 F.2d 1, 2 (1st Cir. 1988). . . . . . . . . . . . . . . . . . 12

*United States v. Bulger*, 928 F. Supp.2d 294 (D. Mass. 2013). . . . . . . . . . . . . . 20

*United States v. Cruikshank*, 92 U.S. 542 (1876). . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Holmes*, 680 F.2d 1372 (11th Cir. 1982). . . . . . . . . . . . . . . . . 12

*United States v. Macchia*, 41 F.3d 35 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . 20

*United States v. Pendergraft,* 297 F.3d 1198 (11th Cir. 2002). . . . . . . . . . . . 11, 13

*United States v. Wampler*, 624 F.3d 1330 (2d Cir. 2010). . . . . . . . . . . . . . . . . 20

*Wu v. Holder,* 617 F.3d 97 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Wu v. Holder*, 646 F.3d 133 (2d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . 15

<u>Constitution</u>

First Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

<u>Rules</u>

N.Y. Rule 1.16(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

N.Y. Rule 1.16(c)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

<u>Statutes</u>

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 15, 21

Appellant, Paul Ceglia, submits this response to the Government's motion to dismiss his interlocutory appeal. The Government argues that the appeal is: 1) barred by the fugitive disentitlement doctrine, and 2) an interlocutory order which this Court lacks jurisdiction to hear. The Government is incorrect on both counts.

## I. Facts in Support of Response to Government's Motion to Dismiss

Paul Ceglia has appealed a collateral order which denied a motion to dismiss his indictment because he has First Amendment immunity and cannot be compelled to stand trial. The District Judge denied the motion to dismiss because, he concluded, the Court cannot decide whether Ceglia is immune from prosecution until *after* he has been tried. Although this issue has yet to be decided by this Court, the District Judge believes this Court would decide the issue as he did. Messina Affirmation Exhibit A, p.10. The defendant respectfully disagrees because Ceglia has the constitutional right *not* to stand trial and the order denying the motion to dismiss is clearly a collateral order which is immediately appealable under 28 U.S.C. § 1291.

With regard to the fugitive disentitlement portion of the motion to dismiss, that determination is within this Court's discretion. It is, however, an equitable exercise informed in part by the following underlying facts and equities.

Paul Ceglia, his wife, two young sons and their family dog are missing. It appears that the family went missing the evening of March 8, 2015. Affirmation of

1

Alexander Wilson ¶ 14.

Mr. Ceglia was criminally charged on October 25, 2012, in the Southern District of New York for wire and mail fraud because he had filed and pursued a civil action for breach of a written contract ("Work for Hire Contract") against Facebook, Inc. and Mark Zuckerberg in the Western District of New York ("the *Facebook* Action"). The criminal prosecution was commenced while the *Facebook* Action was still pending.

The criminal complaint was filed after the Postal Inspector interviewed Mark Zuckerberg, who said the second page of the Work for Hire Contract is authentic and was signed by him and Ceglia, but that Ceglia had fabricated the first page of the contract which grants Ceglia an interest in what became Facebook. Although Ceglia's experts in the *Facebook* Action concluded the Work for Hire Contract is authentic, it was not until *September 27, 2013*, almost one year after Ceglia was arrested, that the Government forensically examined the Work for Hire Contract. Unsurprisingly, the Postal Service's Senior Forensic Document Examiner did not conclude that the Work for Hire Contract had been altered. See Messina Affirmation Exhibit B.

Given the Government's lack of forensic evidence to show that the Work for Hire Contract is not authentic, the Government resubmitted the contract for further forensic testing, this time to the U.S. Secret Service Laboratory in Washington, D.C.

2

Its report, issued on March 11, 2015, also failed to conclude the Work for Hire Contract is not authentic or was otherwise altered .  See Messina Affirmation Exhibit C.  In fact, the conclusions reached in the Secret Service's report serve to corroborate Cegla's experts that the Work for Hire Contract is authentic.[1]/

The criminal prosecution was instigated, it is believed, by Zuckerberg and Facebook, drawing directly upon what can be described as an incestuous relationship between their attorneys, who are former Assistant U.S. Attorneys in the Southern District, and the U.S. Attorney for the Southern District of New York, Preet Bharara, who formerly worked for the same law firm.[2]/  When Ceglia was arrested on October 26, 2012, U.S. Attorney Bharara issued a Press Release stating what Zuckerberg had told the Government was the basis for the prosecution: "CEGLIA simply replaced page one of the real contract with a new page one doctored to make it appear as though Zuckerberg had agreed to provide CEGLIA with an interest in Facebook."  Messina Affirmation Exhibit D.

That charge, which was proven false by Ceglia's experts in the *Facebook Action* and is also discredited by the Government's own experts' reports in this criminal case, left Facebook and Zuckerberg no alternative but to switch horses

---

[1] Ceglia's evidence is discussed in the detailed summary below. Unfortunately, the Secret Service's latest report was not served until after the Ceglia family disappeared.

[2] http://www.justice.gov/usao/nys/meetattorney.html

midstream in the *Facebook* Action and argue that *both* pages of the Work for Hire Contract are fabrications.[3]/ That newly concocted argument by Facebook and Zuckerberg (also shown to be false by Ceglia's experts), was adopted by the Magistrate who accepted it after, according to him, discussing only the evidence *most favorable to Facebook and Zuckerberg* and plaintiff's rebuttal evidence. Nothing has been offered by the Government to explain the contradiction between Zuckerberg's statements to the Government and the arguments he made in the *Facebook* Action.

The Government charged Ceglia criminally in an attempt to chill the exercise of his First Amendment right to pursue the *Facebook* Action. The Government even alluded to the fact that further court filings by Ceglia's lawyers in the *Facebook* Action could result in further charges being brought against him *and his lawyers*. Messina Affirmation Exhibit E, Hearing (May 10, 2013) T.16:20-22:6.[4]/ Facebook and Zuckerberg's lawyer simultaneously told the press that "Facebook also intends to hold accountable all of those who assisted Ceglia in this outrageous

---

[3] In the civil appeals, Ceglia showed it was Zuckerberg and Facebook who deliberately misled the District Court by first claiming the Work for Hire Contract was a page one forgery and the second page was authentic, only to then change the story to a two page forgery, which is inconsistent with Zuckerberg's statements to Government investigators. See *Facebook* Appeal, Appellant's Br. 25-31.

[4] The transcript is from the *Ceglia v. Holder* civil action which was brought to enjoin the criminal prosecution. The appeal from the denial of the injunction in that case is also before this Court (docket number 14-1752), as is the appeal of the *Facebook* Action (docket number 14-1365).

4

fraud." [5]/  The scheme did not succeed in deterring Ceglia from proceeding with the

*Facebook* Action.[6]/

Some of Ceglia's evidence, which the Court was required to take as true in

the *Facebook* Action but did not, follows:[7]/

**Larry Stewart:**  Larry Stewart is the Chief Forensic Scientist and President

of Stewart Forensic Consultants, LLC and the former director of the U.S. Secret

Service's Forensic Laboratory.   His findings and conclusions are:

- after thorough and exhaustive forensic testing of the Work for Hire Contract there is no indication to suggest that the contract is other than genuine.

- there is no evidence to support the conclusion the Work for Hire Contract was altered.

_____

[5] http://dealbook.nytimes.com/2012/10/26/man-claiming-facebook-ownership-arrested-on-fraud-charges/?_r=0.  True to the threat, Facebook and Zuckerberg have brought suit for malicious prosecution in the New York Supreme Court against Ceglia's former lawyers in the *Facebook* Action, DLA Piper, LLP (US), Milberg, LLP, Lippes Mathias Wexler Friedman LLP, Paul Argentieri & Associates and nine individual lawyers who worked on the case.  *Facebook, Inc., v. DLA Piper LLP (US),* Index No. 653183/2014 (Sup. Ct. N.Y. County).

[6] It did, however, succeed in causing his lead counsel to move to be relieved on October 30, 2012, because, as the Magistrate stated in his Order of March 20, 2013, the attorney was said to "fear for his safety" and because of "threats ... made against him" (*Facebook* Action, Doc. 649, p.9), even though, according to the Magistrate, the attorney "states his continued belief that Plaintiff has, in bringing and prosecuting this action, not committed fraud, a factor which could justify withdrawal under N.Y. Rule 1.16(c)(2), (3)." *Id.* at p.6.  The motion was denied.

[7] The Magistrate considered only the evidence most favorable to Facebook and Zuckerberg and relevant rebuttal evidence.  *Facebook* Appeal SA 36, Doc. 651, p.32 ("the court discusses only the evidence most favorable to Defendants' Motion to Dismiss and any relevant rebuttal evidence submitted by Plaintiff").

- the yellow discoloration evident in the Work for Hire Contract was the result of repeated exposure of the document to high intensity and/or UV lights and that based upon videotapes made of the examinations by experts in the underlying civil litigation, the Work for Hire Contract yellowed dramatically between the time the document was provided to Facebook's and Zuckerberg's experts and when it was made available to Ceglia's experts.

- the toner found on page 1 of the Work for Hire Contract matches that found on page 2 and chemical and physical testing failed to detect any differences between toner samples.

*Facebook* Appeal A-1096-1467.

**James Blanco:**   Mr. Blanco is a renowned Forensic Document

Examiner/Examiner of Questioned Documents.  His findings and conclusions are:

- the Work for Hire Contract is an authentic, unaltered document.

- there is no support for the theory of a page 1 substitution, forgery or fraud as alleged by Zuckerberg and the Government.

- the signature, "Mark Zuckerberg" and the initials "MZ" represent the natural, normal and genuine handwriting characteristics of Zuckerberg.

- page 1 of the Work for Hire Contract was originally executed together with page 2 as a companion document.

- page 1 of the Work for Hire Contract was on top of page 2 when the hand-printed interlineation with the handwritten initials "PC" and "MZ" were written on page 1.

- staple holes and secondary staple hole impressions/detent marks on page 1 of the Work for Hire Contract match and align with the staple holes and secondary staple hole impressions/detent marks on page 2 of the Work for Hire Contract, demonstrating that the two pages of the contract were stapled only one time, when they were stapled to each other.

- differences in fonts between pages 1 and 2 of the Work for Hire Contract are

a common occurrence when creating documents by means of "cutting and pasting" from other source documents.

• the initials "PC", found as a latent writing indentation on page 2 of the original Work for Hire Contract, match the position of the written "PC" initials on page 1 of the original Work for Hire Contract and do not match the position of the initials "PC" on the tiff image of page 1 of the Street Fax document.

• the word "is" appears as a visible, handwritten interlineation on page 1 of the Work for Hire Contract and also appears as a latent handwritten impression on page 2 of the Work for Hire Contract, but the same word does not appear in the interlineation on the Street Fax document which contains the word "has" instead.

• the Street Fax document exists only as two computer image ("tiff") files and an original of that document has not been produced for analysis.

• page 1 of the Street Fax document (claimed by Zuckerberg as authentic) was not the original companion page to page 2 of the Work for Hire Contract.

• the hand-printed interlineation observed on page 1 of the Street Fax tiff image was not the source of the latent indent image on page 2 of the Work for Hire Contract because the indent images do not match.

• the front sides of page 1 and page 2 of the Work for Hire Contract were deteriorated or "yellowed," as the result of Facebook's and Zuckerberg's experts' excessive processing, exposure and mishandling of the documents.

*Facebook* Appeal A-1583-2071.

**<u>Katherine Koppenhaver:</u>** Ms. Koppenhaver is a Certified Forensic

Document Examiner.[8]/ Her findings and conclusions are:

• the Work for Hire Contract is an unaltered document which does not contain

---

[8] Ms. Koppenhaver's report was filed in the District Court in the *Holder* Action.

substitutions.

• indentations appear on page 2 of the Work for Hire Contract, which were visible to the naked eye, without side-lighting or magnification.

• the handwritten words and initials "PC" and "MZ" on page 1 and the indentations on page 2 were correctly aligned and the words and initials, which were visible on both pages, matched each other.

• the staple holes on both pages of the Work for Hire Contract show the document was stapled only once and that the staple had been removed, supporting the conclusion that another first page was never stapled to page 2 of the Work for Hire Contract, that page 1 is the only first page that was attached to page 2, and that page 1 was not substituted for another page.

*Holder* Appeal A-358-72.

**Joan M. Winkelman:**  Ms. Winkelman is a Board Certified Forensic

Document Examiner.  She undertook to determine indicators of authenticity in the

Work for Hire Contract by comparing that document with a document described as

the "Kato-Street Fax document".[9]/  Her findings and conclusions are:

• a comparison of images of the two-page Work for Hire Contract and the three-page Kato-Street Fax document, show, based upon the similarities and differences identified in the two documents, that the Work for Hire Contract is authentic.

*Holder* Appeal A-373-401.

**Walter Rantanen:**  Mr. Rantanen is an expert in fiber identification relating

---

[9] It is not disputed that the Kato-Street Fax document is authentic and was used by Mr. Ceglia in 2003, about the time the Work for Hire Contract was prepared and signed by him and Mr. Zuckerberg.  It is not the Street Fax tiff image.  Ms. Winkelman also submitted her report in the *Holder* Action.

to paper. He is an expert used by the U.S. Secret Service to match papers by identifying fiber content. His findings and conclusions are:

•      paper samples taken from pages 1 and 2 of the Work for Hire Contract are consistent with having come from the same paper mill and production run.

*Facebook* Appeal A-1532-1536.

     **Michael Pliszka:** Mr. Pliszka is an expert polygraph examiner, certified in Polygraph Science (Forensic Psychophysiology). He conducted a polygraph examination of Ceglia on June 11, 2011. The examination paid particular attention to the authenticity of the Work For Hire Contract between Ceglia and Zuckerberg. The questions asked during the polygraph examination were designed to determine whether Ceglia forged or doctored the Work for Hire Contract. His findings and conclusions are:

•      after conducting three polygraph charts utilizing a Zone Comparison Technique, and review of the examination utilizing accepted criteria for analysis, the examination results were "No Deception Indicated," which is indicative of an individual telling the truth.

*Facebook* Appeal A-240-252.

     **John Paul Osborn:** Mr. Osborn is a Forensic Document Examiner. He examined the Work For Hire Contract between Ceglia and Zuckerberg. His findings and conclusions are:

•      all of the handwriting and hand-printing on the two pages of the Work for Hire Contract are original writing ink on paper entries.

•      page 2 of the Work for Hire Contract bears indentations caused by the

9

interlineations and handwritten initials on the first page of the Contract.

• the only indentations on the second page of the Contract match, and were caused by, the interlineations and initials on the first page of the Contract.

• the second page of the Work for Hire Contract was underneath page 1 of the Contract when the interlineation and initials were made on page 1.

*Facebook* Appeal A-221-239.

**Neil Broom:** Neil Broom, is an expert in the fields of Computer Forensics,

Network and Computer Security, Information Assistance and Professional Security

Testing. His findings and conclusions are:

• there was an insufficient basis from which Facebook's and Zuckerberg's experts could draw reliable conclusions about fraudulent activity by Mr. Ceglia.

• so-called "anomalies" associated with Mr. Ceglia's electronic media and the documents found on the media are not reliable evidence of fraud.

• his analysis considered the lack of information regarding the "pedigree" of the evidence, the compromised nature of the electronic media due to the presence of malware and viruses, Zuckerberg's noted reputation as a computer hacker and his ability to remotely access the so-called "Ceglia media" and plant images thereon, including apparent emails which he could then remotely transmit from the compromised computer, the highly unusual circumstance of the Street Fax images being two of only *five* "sent" items found on the computer of Ceglia's mother, Vera, the illegible nature of the Street Fax tiff images when the supposed intention was to create a legible document, the explanation of anomalies regarding dates, time stamps, formatting differences, the unreliability of information relating to the reinstallation of operating systems, misidentification of the location where the Street Fax images were found, and the unreliability of conclusions by Facebook's and Zuckerberg's experts due to their lack of sufficient information and data.

*Facebook* Appeal A-1468-1513.

10

**Valery N. Aginsky, Ph.D.:**  Dr. Aginsky is a Forensic Chemist / Ink and Document Dating Specialist.  His findings and conclusions are:

- ink tests performed on relevant documents by experts disclosed by the government and experts retained by Facebook and Zuckerberg in the *Facebook* Action (upon which the Government has also chosen to rely) are invalid based upon current science and the lack of adequate information.

*Facebook* Appeal A-261-275.

Ceglia submits that criminally prosecuting him for having filed a civil action for breach of contract is a violation of his First Amendment right, of *Noerr-Pennington* immunity, and of the widely accepted doctrine in *United States v. Pendergraft,* 297 F.3d 1198, 1209 (11th Cir. 2002), which prohibits prosecutions for wire and mail fraud on precisely the facts alleged in the indictment.

The dismissal of the *Facebook* Action, after reviewing the evidence most favorable to the moving parties, and after Zuckerberg had done an about-face on his one page substitution theory severely shook Ceglia's faith that he would ever get a fair hearing based on the *facts*.  Those events, including the Government's persistence in the face of its own expert's flawed report, were disillusioning and discouraging to Ceglia and may well have led him to despair of ever receiving a fair and impartial hearing in the courts.  This, we acknowledge, is not an excuse if he did flee with his family, but it is an explanation which this Court can consider when deciding whether to apply the fugitive disentitlement doctrine.

11

## II.  Legal Argument

### A.  The Fugitive Disentitlement Rule May Not be Invoked in This Case to Dismiss Ceglia's Interlocutory Appeal

Whether Ceglia's interlocutory appeal should be dismissed on fugitive disentitlement grounds is governed by *Ortega-Rodriguez v. United States*, 507 U.S. 234 (1993) and *Degen v. United States*, 517 U.S. 820 (1996).

In *Ortega-Rodriguez*, the Supreme Court held that fugitive disentitlement would not bar a former fugitive from appealing his sentence because, while a case is pending in a District Court, the District Court is well situated to impose an appropriate punishment, including a separate sentence for flight, that adequately vindicates the public interest in deterring escape and safeguards the court's dignity. *Ortega-Rodriguez,* 507 U.S. at 247-48.  If Ceglia has fled,

> [he has] flouted the authority of the District Court, not the Court of Appeals. ... . [I]t is the District Court that has the authority to defend its own dignity, by sanctioning an act of defiance that occurred solely within its domain.  *See, United States v. Anagnos*, 853 F.2d 1, 2 (1st Cir. 1988) (declining to follow [*United States v.*] *Holmes*, [680 F.2d 1372 (11th Cir. 1982), *cert. denied,* 460 U.S. 1015 (1983)] because former fugitive's "misconduct was in the district court, and should affect consequences in that court, not in ours").

*Id.*

Since Ceglia's disappearance does not affect proceedings in this Court it does not operate to disqualify his interlocutory appeal.  *Id.* at 245.  "While an appellate court has access only to the blunderbuss of dismissal, the district court can tailor a more finely calibrated response."  *Id.* at 247-48.

12

Notably, the Supreme Court has held that appeals premised on the alleged insufficiency of the evidence should not be dismissed under the disentitlement rule because retrial is not permitted in the event of reversal and there would be no prejudice to the Government due to the defendant's absence. *Id.* at 249. The same is true here. Ceglia's appeal seeks to invoke his immunity from prosecution under the First Amendment and *Noerr-Pennington.*[10]/ If Ceglia prevails, he will not have to face trial. In that sense, his appeal is no different than one brought by a fugitive for insufficiency of the evidence and it should be allowed to proceed.

Another concern of the Supreme Court is if the appeal is allowed to proceed in a fugitive's absence it will frustrate the ability to enforce the appeals court's decision. That also is not a concern here. If this Court grants Ceglia's appeal, the decision will be fully enforceable because the criminal case will be dismissed. If the appeal fails, the case will remain in the District Court.

This Court should not dismiss the appeal because doing so would "rest on nothing more than the faulty premise that any act of judicial defiance, whether or not it affects the appellate process, is punishable by appellate dismissal." *Id.* at 250.

In *Degen v. United States*, 517 U.S. 820 (1996), the Supreme Court reversed

---

[10] He also is not chargeable with wire and mail fraud under *United States v. Pendergraft*, 297 F.3d 1198 (11th Cir. 2002), a case which has been widely adopted but which the District Judge who formerly presided over this case rejected although he described it as "persuasive." Messina Affirmation Exhibit F, T.28:11-21.

the invocation of the fugitive disentitlement rule in a forfeiture action that arose out of a criminal prosecution from which Degen was a fugitive. The Court held that invoking the rule "would be an arbitrary response to the conduct it [the disentitlement rule] is supposed to redress or discourage." *Id.* at 828.

With respect to the other purposes of the disentitlement doctrine: the need to "redress the indignity visited upon the District Court" by the defendant's absence and "the need to deter flight from criminal prosecution, the Court held that "[b]oth interests are substantial, but disentitlement is too blunt an instrument for advancing them." *Id.* "The dignity of a court derives from the respect accorded its judgments. That respect is eroded, not enhanced, by too free a recourse to rules foreclosing consideration of claims on the merits." *Id.*

Consistent with *Ortega-Rodriguez* and *Degen*, this Court identified four purposes for the disentitlement rule: 1) assuring the enforceability of any decision that may be rendered against the fugitive; 2) imposing a penalty for flouting the judicial process; 3) discouraging flights from justice and promoting the efficient operation of the courts; and 4) avoiding prejudice to the other side caused by the defendant's escape. *Id.* (*citing Empire Blue Cross & Blue Shield v. Finkelstein*, 111 F.3d 278, 280 (2d Cir. 1997) and *Degen*, 517 U.S. at 824). As shown above, none of these is implicated by Ceglia's absence as to warrant invoking the rule.

This Court noted that "'once a court has determined that a party is a fugitive

14

from justice, the decision on whether to dismiss the appeal should be informed by the reasons for the doctrine and the equities of the case.'" *Wu v. Holder*, 646 F.3d 133, 135 (2d Cir. 2011) (quoting *Wu v. Holder,* 617 F.3d 97, 100 (2d Cir. 2010). The reasons for the doctrine and the equities of the case will not be served by declining to hear this appeal.

### B. The Order Denying Defendant's Motion to Dismiss Because He is Immune From Prosecution Under the First Amendment is Immediately Appealable Under 28 U.S.C. § 1291

The remaining issue is whether the Court has jurisdiction to hear the appeal.

Congress has authorized appeals as of right from final decisions of district courts, with certain exceptions not relevant here. 28 U.S.C. § 1291. Although piecemeal appeals are generally not permitted (*Cobbledick v. United States*, 309 U.S. 323, 325 (1940)), the Supreme Court has created a nonstatutory exception in the case of "collateral orders" which satisfies the "final decision" requirement of § 1291. *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 545-47 (1949).

To qualify as a collateral order, the order must: 1) conclusively determine a disputed question; 2) resolve an important issue separate from the merits of the action; and 3) be effectively unreviewable on appeal from a final judgment. *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468 (1978). These requirements illustrate why the collateral order exception is necessary.

To be effectively unreviewable means that failure to review the interlocutory

order *now* will cause a litigant permanent harm. That a question has been
conclusively determined means that immediate appellate review is necessary to
avoid permanent harm. The requirement for separability will ensure that the appeals
court will not have to consider the same or a similar question more than once.
*Johnson v. Jones*, 515 U.S. 304, 311 (1995). These requirements are intended to
identify the class of orders in which the benefits of immediate appeal will likely
outweigh the detriment associated with multiple appeals. *See e.g., Id.* at 309-11;
*Midland Asphalt Corp. v. United States*, 489 U.S. 794, 799 (1989); *Gulfstream
Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 276 (1988).

      The defendant moved to dismiss the indictment on the ground it violated his
First Amendment right to bring the *Facebook* Action and his immunity from
prosecution under the *Noerr-Pennington* doctrine. The First Amendment
guarantees "the right of the people ... to petition the Government for a redress of
grievances." U.S. Constitution, Amend. I. According to the Supreme Court, "the
right of access to the courts is an aspect of the First Amendment right to petition the
Government for redress of grievances." *Bill Johnson's Restaurants, Inc. v. NLRB*,
461 U.S. 731 (1983). In 1907, the Supreme Court held, "[t]he right to sue and
defend in the courts is the alternative of force. In an organized society, it is the right
conservative of all other rights, and lies at the foundation of orderly government. It
is one of the highest and most essential privileges of citizenship." *Chambers v.*

*Baltimore & Ohio R. Co.*, 207 U.S. 142, 148 (1907). In 2002, the Supreme Court

reaffirmed *Chambers* and its progeny:

> We have recognized this right to petition as one of 'the most precious of the liberties safeguarded by the Bill of Rights,' *United Mine Workers v. Illinois Bar Ass'n*, 389 U.S. 217, 222 (1967), and have explained that the right is implied by 'the very idea of a government, republican in form,' *United States v. Cruikshank*, 92 U.S. 542, 552, 23 L. Ed. 588 (1876).

*BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 524-25 (2002).

The right to petition does not depend upon success. "Nor does the text of the

First Amendment speak in terms of successful petitioning–it speaks simply of 'the

right of the people... to petition the Government for a redress of grievances." *Id.* at

532.

*Noerr-Pennington* immunity derives from *Eastern Railroad Presidents*

*Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) and *United Mine*

*Workers v. Pennington*, 381 U.S. 657, 669 (1965). At its inception, the doctrine

held that private persons were immune from liability under the antitrust laws for

attempts to influence the passage or enforcement of laws, even if the laws would be

anticompetitive. *Noerr*, at 135; *Pennington* at 670. The doctrine now extends

immunity to valid petitions to all departments of government, even if there is an

improper purpose or motive. *See, Noerr, supra*; *Pennington, supra.* "Under the

*Noerr-Pennington* doctrine, those who petition any department of the government

for redress are generally immune from statutory liability for their petitioning

17

conduct." *Sosa v. DirecTV, Inc.*, 437 F.3d 923, 928 (9th Cir. 2006).[11]/ Since inception, the doctrine has expanded beyond antitrust and now confers immunity from a variety of claims. However, neither the First Amendment's Petition Clause nor the *Noerr-Pennington* doctrine protects sham petitions. *Id.*

The allegations in this case of acts of mail and wire fraud are based on the defendant's civil litigation activities in the *Facebook* Action. Ceglia sought an order dismissing the indictment because it rests on litigation activities that are not objectively baseless and are protected by the right to petition. If the Government's contrary *allegation* is all that is needed to force one to stand trial for pursuing a lawsuit that is not objectively baseless, then there is no immunity.

The District Court was required to decide whether Ceglia's First Amendment immunity from prosecution was vitiated so that he must stand trial in this case. "*PRE II* recognized the applicability of the first aspect of the breathing space principle when it defined the *Noerr-Pennington* doctrine's 'sham litigation' exception as requiring both objective baselessness and an improper motive." *Sosa,* 437 F.3d at 934 (*citing Professional Real Estate Investors v. Columbia Pictures*

---

[11] *See also,California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 509-11 (1972); *A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.*, 263 F.3d 239, 250 (3d Cir. 2001); *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988); *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993); *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 122 (3d Cir.), *cert. denied*, 528 U.S. 871 (1999).

*Industries, Inc. [PRE II]*, 508 U.S. 49, 60-61 (1993). "This definition over-protects baseless petitions so as to ensure citizens may enjoy the right of access to the courts *without fear of prosecution*. *BE&K*[, *supra*] made this breathing room protection explicit." *Sosa, supra* at 934 (emphasis added). The District Court was required to determine whether the underlying *Facebook* Action was objectively baseless.

The District Judge presiding over the criminal case at the time stated, "[A] triable issue of fact really doesn't mean a whole lot in the criminal context." Messina Affirmation Exhibit G, T.15:4-5. However, in a *Noerr-Pennington* analysis, the existence or non-existence of a triable issue of fact is critical because it supports or negates a finding of objective baselessness. "You have experts who say one thing about that contract. The government has experts who will say something else. You say this is a triable issue of fact. I agree, it is a triable issue of fact." Messina Affirmation Exhibit G, T.15:1-4. By implication, the Court acknowledged that, on the evidence described above, the underlying *Facebook* Action was not objectively baseless, or a sham. Nonetheless, in the Memorandum and Order, the Court concluded that "winnable fraudulent litigation" is not entitled to *Noerr-Pennington* immunity in the Second Circuit until "after a trial on the merits." Messina Affirmation Exhibit A, p.15. This is a complete divestiture of a defendant's First Amendment right not to have to *stand trial* and relegates that right to the status of an affirmative defense.

19

Although often colloquially referred to as a "defense," a claim of immunity is not an affirmative defense negating criminal intent, but instead a defense of avoidance that seeks to bar a prosecution *en toto*.

*United States v. Bulger*, 928 F. Supp.2d 294 (D. Mass. 2013).

The Government has conceded that "while it is true that parties who maintain civil suits generally are entitled to immunity for doing so under the *Noerr-Pennington* doctrine of immunity, to be so cloaked the litigation must not be a 'sham'." Doc. 38, p. 27. That determination has yet to be made.

Whether Ceglia is immune from having to face trial is a question separate from the question of his guilt or innocence, separate from questions concerning trial procedures, it raises a question of clear constitutional importance, and is effectively unreviewable on appeal from a final judgment. It is an appealable collateral order. *Sell v. United States*, 539 U.S. 166, 176 (2003). *See also, United States v. Macchia*, 41 F.3d 35, 39 (2d Cir. 1994) ("an interlocutory appeal will lie in the criminal context only where the constitutional...protection relied upon confers a *right not to be tried,* as distinguished from a right to be free of some adverse action for which the remedy is dismissal of the indictment) (emphasis added); *accord, United States v. Wampler*, 624 F.3d 1330, 1337 (2d Cir. 2010) (criminal defendant can pursue an interlocutory appeal where the constitutional protection is a right not to be tried).

"'The First Amendment would...be a hollow promise if it left government free to destroy or erode its guarantees by indirect restraints so long as no law is passed

that prohibits free speech, press, petition, or assembly as such.'" *Sosa,* 437 F.3d at 934 (*quoting Ill. State Bar Ass'n*, 389 U.S. at 222).

The District Court's denial of defendant's First Amendment claim of immunity from standing trial is an appealable collateral order under 28 U.S.C. § 1291.

### III.  Conclusion

The appellant respectfully submits that the Government's motion to dismiss defendant's appeal on grounds of fugitive disentitlement or lack of jurisdiction should be denied.

Respectfully submitted,

By:    s/ Gil D. Messina
       Gil D. Messina, Attorney for Defendant/
       Appellant, Paul Ceglia

Dated:   March 23, 2015
         Holmdel, NJ

21