**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff-Appellee, | : | Docket No. 15-628 |
| | : | |
| v. | : | |
| | : | |
| PAUL CEGLIA, | : | |
| | : | |
| Defendant-Appellant. | : | |
| | : | |

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**AFFIRMATION OF GIL D. MESSINA IN SUPPORT OF**
**APPELLANT'S RESPONSE TO APPELLEE'S**
**MOTION TO DISMISS APPEAL**

State of New Jersey }
       }   SS.}
County of Monmouth}

  Gil D. Messina, pursuant to Title 28, United States Code, Section 1746, hereby affirms under penalty of perjury:

1. I am an attorney representing Mr. Paul Ceglia, the defendant-appellant in this appeal. I respectfully submit this affirmation in support of Mr. Ceglia's Response to the government's Motion to Dismiss on the Ground of Fugitive Disentitlement and Lack of Subject Matter Jurisdiction.

2. Attached hereto as Exhibit A is a true copy of the District Court's February 9, 2015 Memorandum and Order that is the subject of this appeal.

3. Attached hereto as Exhibit B is a true copy of the United States Postal Service Forensic Laboratory Examination Report.

4. Attached hereto as Exhibit C is a true copy of the United States Secret Service Forensic Services Division Report.

5. Attached hereto as Exhibit D is a true copy of Preet Bharara's October 26, 2012 Press Release.

6. Attached hereto as Exhibit E is a true copy of an excerpt of the Transcript of Oral Argument taken on May 10, 2013 in the *Ceglia v. Holder, et al.* civil case.

7. Attached hereto as Exhibit F is a true copy of an excerpt of the

Transcript of Proceedings held on March 7, 2014 in *United States v. Ceglia*.

8. Attached hereto as Exhibit G is a true copy of an excerpt of the

Transcript of Proceedings held on October 23, 2014 in *United States v. Ceglia*.

Dated: March 23, 2015
     Holmdel, New Jersey

                         /s/Gil D. Messina
                         Gil D. Messina

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                      :
UNITED STATES OF AMERICA,                             :
                                                      :
                              Plaintiff,              :
                                                      :
              - against -                             :
                                                      :
PAUL CEGLIA,                                          :
                                                      :
                              Defendant.              :
                                                      :
------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/9/2015
```

12-CR-876 (VSB)

**MEMORANDUM & ORDER**

Appearances:

Alexander Joshua Wilson
Janis Echenberg
Assistant United States Attorneys
New York, NY

*Counsel for Plaintiff*

Robert Ross Fogg
Law Office of Robert Ross Fogg
Buffalo, NY

Gil D. Messina
Messina Law Firm, P.C.
Holmdel, NJ

*Counsel for Defendant*

VERNON S. BRODERICK, United States District Judge:

Before me is the Motion to Dismiss on First Amendment Grounds filed by Defendant

Paul Ceglia ("Ceglia"). (Doc. 111.) The Indictment, (Doc. 10), effectively alleges the civil

litigation initiated by Ceglia against Facebook, Inc. ("Facebook") and its founder and Chief

Executive Officer Mark Zuckerberg ("Zuckerberg") was a sham and was therefore unprotected

by the First Amendment.[1]  Ceglia's assertion of First Amendment immunity does not entitle him

---

[1] Although the Indictment does not explicitly state that Ceglia's civil litigation was a sham, it does allege that Ceglia

to pretrial fact-finding as to the veracity of the Indictment's allegations. Accordingly, for the reasons stated below, Ceglia's Motion must be denied.

## I.     Background and Procedural History

Ceglia is charged with one count of mail fraud pursuant to 18 U.S.C. § 1341 and one count of wire fraud pursuant to 18 U.S.C. § 1343. (*See* Doc. 10 ¶¶ 8, 10.) The Indictment alleges that Ceglia and Zuckerberg entered into a legitimate contract on April 28, 2003, pursuant to which Zuckerberg agreed to perform computer programming work for Ceglia in exchange for a fee. (Doc. 10 ¶ 5.) This work was wholly unrelated to Facebook, (*id.*), which officially launched in February 2004, (*id.* ¶ 1). The Indictment alleges that Ceglia engaged in a scheme to defraud Facebook and Zuckerberg and to "corrupt the federal judicial process." (*Id.* ¶ 4.) In furtherance of this scheme, Ceglia allegedly altered his contract with Zuckerberg to make it appear that Zuckerberg had agreed to provide Ceglia with at least a 50 percent ownership interest in Facebook. (*Id.* ¶ 5.) In furtherance of the alleged scheme to defraud, Ceglia filed a civil lawsuit against Facebook and Zuckerberg to assert his purported ownership interest in Facebook. (*See id.* ¶ 6.) The Indictment further alleges that Ceglia manufactured evidence, including purported email exchanges with Zuckerberg, and destroyed evidence inconsistent with the civil lawsuit's false claim.[2] (*Id.* ¶ 7.)

---

made intentional and material misrepresentations that went to the core of his civil case. Specifically, the Indictment alleges that Ceglia engaged in a multi-billion dollar scheme to defraud Facebook and Zuckerberg by: doctoring or otherwise converting a legitimate contract with Zuckerberg to make it appear that he had a 50 percent ownership interest in Facebook; manufacturing evidence, including purported email exchanges with Zuckerberg; initiating a civil lawsuit to falsely and fraudulently assert this ownership interest; and destroying evidence inconsistent with the civil lawsuit's false claim. (Doc. 10 ¶¶ 5, 6, 7.)

[2] Ceglia's civil action was initially filed in the Supreme Court of the State of New York and was removed to the United States District Court for the Western District of New York. The district court granted Facebook and Zuckerberg's motion to dismiss for fraud on the court, finding that "clear and convincing evidence establishes" that the purported contract introduced by Ceglia "is a recently created fabrication." *Ceglia v. Zuckerberg*, No. 10-CV-569A, 2013 WL 1208558, at *4 (W.D.N.Y. Mar. 26, 2013), *report and recommendation adopted in full*, 2014 WL 1224574 (W.D.N.Y. Mar. 25, 2014). Ceglia is currently appealing the civil action's dismissal to the Second Circuit. *See* No. 14-1365 (2d Cir. filed Apr. 30, 2014). Ceglia also filed a federal civil action in the Western District of New

This case was originally assigned to the Honorable Andrew L. Carter, Jr. On November

27, 2013, Ceglia, who was at that time represented by the Federal Defenders of New York, filed

a motion to dismiss the indictment. (Doc. 35.) The motion argued, *inter alia*, that the Indictment

violated Ceglia's First Amendment right to petition the government for redress of grievances.

(*Id.* at 30-34.) Specifically, Ceglia argued that he was immune from prosecution under the so-

called *Noerr-Pennington* doctrine, which generally shields private persons from liability for their

litigation activities unless the litigation was a sham.[3] (*See id.* at 31-32.)

After full briefing, (*see* Docs. 38, 39), Judge Carter denied Ceglia's motion to dismiss in

an oral ruling from the bench on March 7, 2014. With respect to the *Noerr-Pennington* issue,

Judge Carter concluded that any finding as to whether the civil litigation was a sham and whether

Ceglia was immune from liability would need to wait until trial. Judge Carter ruled:

> Both sides seem to agree that the *Noerr-Pennington* doctrine shields litigation
> activity in a commercial context, except where the litigation is a sham. The
> government asserts that the litigation is, in fact a sham and that Ceglia is not entitled
> to immunity as a result. Ceglia, in return, has urged me to hold a hearing, and I
> have determined that I am not going to hold such a hearing. It does appear to me
> that if *Noerr-Pennington* immunity is something I am going to have to determine,
> it would be more appropriately raised at the end of trial once all the evidence is in.
> It's inappropriate for me to make factual determinations about the government's
> evidence at this early stage. Therefore, Ceglia's motion to dismiss the indictment
> is denied.

(Doc. 42 at 29:19-30:6.)

On September 15, 2014, Ceglia relieved the Federal Defenders of New York as counsel

and retained private counsel. (*See* Docket Entry of Sept. 15, 2014.) On December 18, 2014,

---

York seeking to enjoin this criminal prosecution on First Amendment grounds. That action was also dismissed, *see*
Doc. 71, *Ceglia v. Holder*, No. 13-CV-256-A (W.D.N.Y. Mar. 25, 2014), and Ceglia is also currently appealing its
dismissal before the Second Circuit, *see* No. 14-1752 (2d Cir. filed May 21, 2014).

[3] The name derives from *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127
(1961), and *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965). I will discuss the *Noerr-
Pennington* doctrine in greater detail below.

3

Ceglia filed this Motion, (Doc. 111), again arguing that he is immune from prosecution under the *Noerr-Pennnington* doctrine. The Government filed a memorandum of law in opposition on January 7, 2015. (Doc. 118.) Judge Carter then transferred this case in an exercise of his discretion to manage his docket, and the case was reassigned to me on January 8, 2015. (*See* Docket Entry of Jan. 8, 2015.) Ceglia filed a reply memorandum on January 15, 2015, (Doc. 120), as well as a letter citing supplemental authority on January 29, 2015, (Doc. 124).

I heard argument on the Motion at a conference on January 30, 2015.[4] During this conference, I explained that this Motion is, in substance, a motion for reconsideration of Judge Carter's previous ruling on the *Noerr-Pennington* issue. I further explained that the Motion did not comply with the requirements of Local Criminal Rule 49.1, which requires that all motions for reconsideration be filed within fourteen days of the original decision and "set[] forth concisely the matters or controlling decisions which counsel believes the Court has overlooked." S.D.N.Y. Local Crim. R. 49.1(d); *see, e.g.*, *United States v. Almonte*, No. 14-CR-86, 2014 WL 3702598, at *1-2 (S.D.N.Y. July 24, 2014) (denying motion for reconsideration of denial of motion to suppress for failure to identify legal authority overlooked in previous decision). However, I advised the parties that I intended to reach the merits of Ceglia's Motion and would set forth my conclusions in a written decision.

## II.    Legal Standard

An indictment must provide "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c). Pursuant to Rule 12, the defendant may raise by pretrial motion any defense, objection, or request that I may resolve

---

[4] During the conference, I also denied various other defense motions. I stated the reasons for those denials on the record.

4

without a trial on the merits, including the indictment's failure to state an offense. Fed. R. Crim.
P. 12(b)(1), 12(b)(3)(B)(v). However, motions to dismiss indictments are disfavored, as the
dismissal of an indictment is an "extraordinary remedy reserved only for extremely limited
circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165
(2d Cir. 2001) (internal quotation marks omitted); *see United States v. Laurent*, 861 F. Supp. 2d
71, 109 (E.D.N.Y. 2011). The Second Circuit has "consistently upheld indictments that do little
more than to track the language of the statute charged and state the time and place (in
approximate terms) of the alleged crime." *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000)
(internal quotation marks omitted). Unless the Government has made a full proffer of the
evidence it intends to present at trial, the validity of an indictment is determined only by the
sufficiency of its allegations, not the sufficiency of the Government's proof. *See United States v.
Perez*, 575 F.3d 164, 166 (2d Cir. 2009). Thus, in considering a motion to dismiss, "the Court
relies on the Indictment and accepts the allegations of the Indictment as true." *United States v.
Heicklen*, 858 F. Supp. 2d 256, 261 (S.D.N.Y. 2012) (citing *United States v. Goldberg*, 756 F.2d
949, 950 (2d Cir. 1985)). Here, Judge Carter determined after oral argument that the Indictment
was sufficiently detailed to provide Ceglia with notice of the charges against him. (Doc. 42 at
25-29.) The applicability of the *Noerr-Pennington* doctrine is discussed below.

## III.    Discussion

### A.    *The* Noerr-Pennington *Doctrine*

The First Amendment provides that "Congress shall make no law respecting . . . the right
of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I.
The *Noerr-Pennington* doctrine arose to protect this First Amendment right in the context of
antitrust law. Under *Noerr-Pennington*, individuals and firms that petition the government for

5

redress are "generally immune from antitrust liability" for any anticompetitive effect of their petitioning. *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus. Inc.*, 508 U.S. 49, 56 (1993) ("*PRE II*"). The doctrine originally protected petitioning in the form of efforts to persuade the legislature or the executive to adopt a particular policy. *See E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136-37 (1961). It then expanded to include petitioning of the courts in the form of a lawsuit, as "the right to petition extends to all departments of the Government, and . . . 'the right of access to the courts is but one aspect of the right to petition.'" *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 525 (2002) (quoting *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972)) (alterations omitted).

"[W]hile genuine petitioning is immune from antitrust liability, sham petitioning is not." *BE & K Constr.*, 536 U.S. at 525-26. Sham petitioning includes sham litigation. *See Primetime 24 Joint Venture v. Nat'l Broad. Co., Inc.*, 219 F.3d 92, 100-01 (2d Cir. 2000). The Supreme Court has adopted a two-part definition of sham litigation. A lawsuit is a sham, and the person who filed it is not immune from liability for the consequences of doing so, only if the suit is both objectively meritless and subjectively a pretext for an improper motive:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation.

*PRE II*, 508 U.S. at 60 (footnote omitted); *see In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 686 (2d Cir. 2009) ("*In re DDAVP*"); *Primetime 24*, 219 F.3d at 100-01.[5] The

---

[5] This test applies to determine whether a single lawsuit constitutes sham petitioning. Where the defendant is alleged to have initiated a series of legal proceedings, a different test determines whether that larger course of litigation was a sham. *See Primetime 24 Joint Venture v. Nat'l Broad. Co., Inc.*, 219 F.3d 92, 101 (2d Cir. 2002). Because the Indictment alleges that Ceglia initiated one lawsuit, (Doc. 10 ¶ 6), the test for determining whether a single lawsuit constitutes sham petitioning applies here.

6

dual requirements that litigation be objectively baseless and subjectively motivated to inflict harm are designed to afford "breathing space" to the First Amendment right to petition. *Sosa v. DirecTV, Inc.*, 437 F.3d 923, 934 (9th Cir. 2006). In other words, the two-part definition of sham litigation "overprotects baseless petitions so as to ensure citizens may enjoy the right of access to the courts without fear of prosecution." *Id.*

The *Noerr-Pennington* doctrine has been extended beyond antitrust law. *See, e.g., BE & K Constr.*, 536 U.S. 516 (immunity from liability for unfair labor practices under the National Labor Relations Act); *Sosa*, 437 F.3d 923 (immunity from liability under the Racketeer Influenced and Corrupt Organizations (RICO) Act); *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 701 F. Supp. 2d 568 (S.D.N.Y. 2010) (immunity from liability for civil rights claims under 42 U.S.C § 1983); *Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft*, 189 F. Supp. 2d 385, 392 (E.D. Va. 2002) ("It is now clear that the doctrine has been extended to confer immunity from a variety of [state] tort claims, including claims of tortious interference and abuse of process."). Courts have also concluded that *Noerr-Pennington* immunity can attach to actions beyond the filing of a lawsuit, such as demand letters, threats of litigation, and settlement offers. *See Primetime 24*, 219 F.3d at 100 (collecting cases).

Whether a criminal defendant can invoke the *Noerr-Pennington* doctrine at all is an open question.[6] Neither party has identified a criminal case in which a court has concluded that *Noerr-Pennington* applies, or has even considered the issue. It does appear that *Noerr-Pennington* immunity can be asserted in actions initiated by the Government. For instance, in *United States v. Philip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009), a civil RICO action

---

[6] Ceglia argues that it can. The Government takes no position on whether *Noerr-Pennington* can ever apply in a criminal case and simply contends that Ceglia is not entitled to immunity in this one.

initiated by the Government against large tobacco companies, the D.C. Circuit concluded that the companies were not entitled to immunity because *Noerr-Pennington* "does not protect deliberately false or misleading statements," *id.* at 1123, but did not question whether the *Noerr-Pennington* doctrine could apply in principle. Furthermore, the doctrine originated in cases brought under the Sherman Act, which provides for both criminal and civil penalties, *see* 15 U.S.C. § 1. In addition, if the purpose of *Noerr-Pennington* is to provide "breathing space" for the First Amendment right to petition, *BE & K Constr.*, 536 U.S. at 531, there would seem to be no principled reason why it could not shield persons from criminal as well as civil penalties. For purposes of this Motion, however, I need not decide whether *Noerr-Pennington* can ever apply in criminal prosecutions.

### B.    *Application*

Assuming *arguendo* that a criminal defendant can assert *Noerr-Pennington* immunity, Ceglia is not entitled to dismissal of the Indictment because the conduct alleged in the Indictment is not protected by the First Amendment as a matter of law.

### 1.    Preliminary Fact-Finding

Ceglia argues that I must make a factual determination now whether his civil lawsuit against Facebook and Zuckerberg was a sham. (Doc. 111 at 4, 9.) He further argues that the suit cannot possibly have been "objectively baseless" because there are competing expert opinions and a legitimate factual dispute as to whether the contract purportedly granting him partial ownership of Facebook was forged or authentic.[7] (*See id.*) The Government contends that the

---

[7] I note that Ceglia is apparently referencing experts he retained in his civil case. Whatever their opinions or conclusions may have been, they are not before me. Neither the Government nor Ceglia have yet provided notice of their intent to call experts in this case. I also note that the opinions of these experts were before Magistrate Judge Leslie G. Foschio when Judge Foschio issued the 155 page Report and Recommendation dismissing Ceglia's civil litigation against Facebook and Zuckerberg based in part on the ground that the purported contract on which the lawsuit was based was a fabrication. District Judge Richard J. Arcara agreed with Judge Foschio's recommendation

8

Indictment alleges that Ceglia initiated a fraudulent lawsuit and that, if this allegation is proven at trial, the Government would also have proven that Ceglia is not entitled to *Noerr-Pennington* immunity. (*See* Doc. 118 at 12-13 & n.5.) I conclude, as Judge Carter previously did, that it would be unnecessary and improper for me to make any factual findings in resolving Ceglia's Motion to Dismiss.

Some forms of immunity, such as tribal sovereign immunity and qualified immunity for state officers, provide immunity from suit. *See, e.g.*, *Oneida Indian Nation of N.Y. v. Madison Cnty.*, 665 F.3d 408, 414 (2d Cir. 2011); *Toussie v. Powell*, 323 F.3d 178, 182 (2d Cir. 2003). *Noerr-Pennington* immunity, by contrast, only provides immunity from "liability." *E.g.*, *PRE II*, 508 U.S. at 56; *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 495, 499, 509 n.11 (1988) (characterizing *Noerr-Pennington* as immunity "from antitrust liability"); *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 837, 838, 841, 842, 845 (7th Cir. 2011) (same); *In re DDAVP*, 585 F.3d at 685, 686 (same); *T.F.T.F. Capital Corp. v. Marcus Dairy, Inc.*, 312 F.3d 90, 92, 93 (2d Cir. 2002) (per curiam) (same); *Suburban Restoration Co., Inc. v. ACMAT Corp.*, 700 F.2d 98, 99 (2d Cir. 1983) ("Because we find that Connecticut would interpret its law to exempt from liability activities excluded from the ambit of the Sherman Act by the *Noerr-Pennington* doctrine, we affirm the dismissal."); *Landmarks Holding Corp. v. Bermant*, 664 F.2d 891, 895-96 (2d Cir. 1981) (characterizing the central issue on appeal as whether defendants' "conduct, as alleged in the complaint and revealed through discovery, is immunized by the First Amendment from antitrust liability under the Noerr-Pennington doctrine"). In other words, the doctrine does not provide immunity from being sued. Translated to the criminal context, even if Ceglia were entitled to *Noerr-Pennington* immunity, it would only shield him from being

and granted Facebook's motion to dismiss.

9

convicted, not from being prosecuted.

When civil defendants invoke the *Noerr-Pennington* doctrine, courts routinely evaluate their claim to *Noerr-Pennington* immunity as they would evaluate any other issue in the given procedural posture of the case. Thus, when a defendant moving to dismiss a civil complaint for failure to state a claim under Rule 12(b)(6) claims *Noerr-Pennington* immunity, the reviewing court asks whether the complaint alleges sufficient facts to support a reasonable inference that the defendant's challenged conduct constituted sham petitioning. *See, e.g., Primetime 24*, 219 F.3d at 101; *Shetiwy v. Midland Credit Mgmt.*, 980 F. Supp. 2d 461, 475-76 (S.D.N.Y. 2013); *Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 429 (S.D.N.Y. 2010). Similarly, a civil defendant invoking *Noerr-Pennington* is entitled to summary judgment in its favor if it shows that there is no genuine dispute of material fact and it is entitled to judgment as a matter of law that its challenged conduct was not a sham. *See, e.g., PRE II*, 508 U.S. at 62-65; *Krasnyi Oktyabr, Inc. v. Trilini Imports*, 578 F. Supp. 2d 455, 475 (E.D.N.Y. 2008). The fact-finder can also determine at trial whether the defendant's challenged conduct constituted sham petitioning. *See Cal. Motor Transp.*, 404 U.S. at 515-16. Accordingly, there is no authority to suggest that I should engage in special preliminary fact-finding on the *Noerr-Pennington* issue. Any factual determination as to whether Ceglia's civil suit was a sham can and should wait until evidence has been presented at trial.[8] Indeed, under Rule 12(b)(2), if a motion to dismiss an indictment raises an as-applied constitutional challenge that depends upon the resolution of disputed facts, that motion *cannot* be resolved until after trial. *See United States v. Pope*, 613 F.3d 1255, 1258-61 (10th Cir. 2010); *see also United States v. Doe*, 63 F.3d 121, 125 (2d Cir. 1995).

---

[8] This is perhaps especially so in the criminal context, where there are particular concerns about requiring the government to provide the defendant with a full preview of the case it will present at trial. *See United States v. Morgan*, 690 F. Supp. 2d 274, 285 (S.D.N.Y. 2010).

10

I will therefore treat Ceglia's Motion as I would treat any other motion to dismiss an indictment advancing an as-applied constitutional challenge where the government has not made a full proffer of the evidence it intends to present. I may not analyze the Government's proof, but must simply analyze whether the allegations of the Indictment state a criminal offense under a statute whose application to the alleged conduct is not unconstitutional. *See Perez*, 575 F.3d at 166; *Heicklen*, 858 F. Supp. 2d at 261-62. Dismissal is not proper unless the conduct alleged in the Indictment is protected by the First Amendment as a matter of law. *See, e.g., United States v. Smith*, 985 F. Supp. 2d 547, 587-606 (S.D.N.Y. 2014) (assuming the truth of the indictment's allegations and concluding that honest services fraud statute was not unconstitutionally void for vagueness as applied); *United States v. Robitaille*, No. 12-CR-76, 2012 WL 5306179, at *2 (D. Vt. Oct. 26, 2012) (denying motion to dismiss indictment alleging "threats" because the meaning of the word excludes constitutionally protected speech, although the government would later need to prove that the defendant had the requisite intent to make his speech unprotected); *United States v. Larson*, 807 F. Supp. 2d 142, 165-66 (S.D.N.Y. 2011). Thus, the only relevant question at this stage is whether, assuming the allegations of the Indictment to be true, the conduct alleged by the Indictment is shielded by *Noerr-Pennington* immunity as a matter of law.

## 2. Sufficiency

The Indictment alleges that Ceglia engaged in conduct unprotected by *Noerr-Pennington* immunity by filing a sham lawsuit.

### a. Objective Baselessness

"First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *PRE II*, 508 U.S. at 60; *see In re DDAVP*, 585 F.3d at 694. Other Circuits have recognized that this definition of "objectively baseless"

11

litigation contains a "sizable loophole": if a sophisticatedly fraudulent lawsuit succeeds or comes close, it cannot be said that no reasonable litigant realistically could have expected the suit to succeed on the merits. *Mercatus Grp.*, 641 F.3d at 834. Accordingly, these Circuits have recognized that the sham petitioning exception to *Noerr-Pennington* immunity must also encompass fraudulent but winnable litigation. In these Circuits, litigation involving an intentional and material misrepresentation that deprives the proceedings of legitimacy qualifies as "objectively baseless," even if it actually succeeds or stands a realistic chance of success. *See Mercatus Grp.*, 641 F.3d at 834; *Phillip Morris Co.*, 566 F.3d at 1123; *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 123-24 (3d Cir. 1999); *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1060-62 (9th Cir. 1999). This particular variant of the sham petitioning exception is sometimes called the "fraud exception" to *Noerr-Pennington* immunity. *E.g.*, *Balt. Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 402 (4th Cir. 2001).

Ceglia argues that there is no fraud exception to *Noerr-Pennington* immunity in the Second Circuit, and that his civil suit was not objectively baseless because a fact-finder could have agreed with his expert witnesses that the contract purportedly granting him partial ownership of Facebook was authentic. (*See* Doc. 111 at 8-9; Doc. 120 at 7-10; Doc. 124 at 2-3.) It appears that the Second Circuit has never directly held whether winnable lawsuits premised upon intentional and material misrepresentations can qualify as objectively baseless under *Noerr-Pennington*. Although some cases provide inferential support for Ceglia's view that our Circuit would part company with the others if it were to address this question, I am persuaded by more recent case law to the contrary.

On the one hand, the Second Circuit has explained that "[i]t is generally true that a winning lawsuit is a reasonable effort at petitioning for redress and therefore not a sham."

12

without acknowledging any exception for winning lawsuits premised upon intentional and
material representations. *T.F.T.F. Capital*, 312 F.3d at 94 (internal quotation marks omitted); *see
also Mosdos Chofetz Chaim*, 701 F. Supp. 2d at 597 ("[D]enying [*Noerr-Pennington*] protection
to *any* viable lawsuit, initiated even for allegedly improper reasons, would unnecessarily
undermine First Amendment principles . . . ." (emphasis added)). Some District Judges have
observed that the Second Circuit interprets the sham petitioning exception to *Noerr-Pennington*
immunity more narrowly than other Circuits do. *See, e.g., Jackson Hill Road Sharon CT, LLC v.
Town of Sharon*, No. 3:07-CV-1445, 2010 WL 2596927, at *9 (D. Conn. June 24, 2010); *Doron
Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 191-92 (S.D.N.Y. 2006).

On the other hand, however, more recent authority suggests that, here as elsewhere, a
fraudulent but winnable lawsuit can be considered objectively baseless. The most notable case is
*In re DDAVP*, 585 F.3d 677. There, drug purchasers asserted antitrust claims against the drug's
manufacturer, based in part on the manufacturer's lawsuit against a competitor in which the
manufacturer attempted to enforce a patent it had allegedly procured by fraud. *See id.* at 681-83.
The Second Circuit held that the purchaser plaintiffs had validly stated an antitrust claim based
upon the manufacturer's allegedly fraudulent procurement of the patent. *See id.* at 692-94. It
also concluded that the plaintiffs had adequately alleged that the manufacturer's patent lawsuit
was objectively baseless sham litigation not entitled to *Noerr-Pennington* immunity. *See id.* at
694. In reaching this conclusion, the Second Circuit relied entirely on the allegations of
intentional and material fraud associated with the underlying patent application. *See id.* It did
not require the plaintiffs to separately allege that no reasonable litigant could have realistically
expected the manufacturer's patent lawsuit to succeed in spite of its fraudulent premise. Thus, at
least for the purposes of pleading, *In re DDAVP* strongly suggests that allegations of a lawsuit's

materially and intentionally fraudulent premise suffice to allege its objective baselessness under *Noerr-Pennington*. Similarly, two recent District Court decisions have concluded that material, intentional misrepresentations in litigation are not shielded by *Noerr-Pennington* from liability under the Fair Debt Collection Practices Act—without considering whether those misrepresentations stood a realistic chance of succeeding. *See Shetiwy*, 980 F. Supp. 2d at 475-76; *Fritz v. Resurgent Capital Servs., LP*, 955 F. Supp. 2d 163, 175-77 (E.D.N.Y. 2013).

Accordingly, I am not persuaded that winnable lawsuits based upon intentional and material misrepresentations cannot fall within the sham petitioning exception to *Noerr-Pennington* immunity in this Circuit. To the contrary, I am convinced that a lawsuit with an intentionally fraudulent premise is "objectively baseless" even if the fraud is sophisticated enough that it stands some realistic chance of duping the fact-finder. After all, it is axiomatic that the First Amendment does not protect fraud. *See, e.g., Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003); *United States v. Konstantakakos*, 121 F. App'x 902, 905 (2d Cir. 2005) (summary order); *United States v. Rowlee*, 899 F.2d 1275, 1279 (2d Cir. 1990). I therefore conclude that there is a valid "fraud exception" to *Noerr-Pennington* immunity in this Circuit.

The Indictment alleges that Ceglia doctored a legitimate contract with Zuckerberg to make it appear that he had a 50 percent ownership in Facebook, and that Ceglia subsequently initiated a civil lawsuit to falsely and fraudulently assert this ownership interest. (Doc. 10 ¶¶ 5, 6). In other words, the Indictment alleges that Ceglia's civil lawsuit against Zuckerberg and Facebook involved intentional and material misrepresentations that went to the core of the case. *See, e.g., Balt. Scrap Corp.*, 237 F.3d at 401-02; *Cheminor Drugs*, 168 F.3d at 123-24. Accordingly, under the "fraud exception," the Indictment alleges that Ceglia initiated objectively

14

baseless litigation.

Even if the "fraud exception" did not exist in this Circuit,[9] I still could not conclude that Ceglia's civil suit was not objectively baseless as a matter of law, and dismissal would still not be warranted. By arguing that a reasonable litigant could have realistically expected success in his civil suit because expert witnesses opined that his version of the contract was legitimate, (*see* Doc. 111 at 9; Doc. 128 at 2-3), Ceglia challenges the sufficiency of the Government's proof rather than the Indictment's allegations. The Indictment simply alleges that Ceglia doctored a legitimate contract signed on April 28, 2003, to make it appear as though Zuckerberg had granted him at least a 50 percent ownership interest in Facebook, which officially launched in February 2004. (*See* Doc. 10 ¶¶ 1, 5.) Taking these allegations as true, in the absence of the fraud exception, I could not conclude as a matter of law that a reasonable litigant could expect this litigation to succeed. Nor could I conclude as a matter of law that *no* reasonable litigant could realistically expect this lawsuit to succeed. The answer would simply depend upon the proof at trial of additional facts not alleged in the Indictment. Therefore, even in the event that winnable fraudulent litigation were entitled to *Noerr-Pennington* immunity in the Second Circuit, which I conclude it is not, Ceglia's as-applied First Amendment challenge to the Indictment can only be determined after a trial on the merits. *See* Fed. R. Crim. P. 12(b)(1). Under these circumstances, I would be required to wait until trial to resolve the Motion, and dismissal at this stage would still be improper.[10] *See Pope*, 613 F.3d at 1258-59; *Doe*, 63 F.3d at

---

[9] Again, the "fraud exception" is merely a variant of the sham petitioning exception. *See Mercatus Grp.*, 641 F.3d at 843.

[10] I assume the *Noerr-Pennington* motion would be made as part of Defendant's motion pursuant to Rule 29(a) "[a]fter the government closes its evidence or after the close of all the evidence," and "a judgment of acquittal" would be entered for "any offense for which the evidence is insufficient to sustain a conviction." I reach no conclusions at this time as to the appropriate burden of proof on the *Noerr-Pennington* issue, or as to whether the jury would need to decide it.

15

125.

### b.    Subjective Intent To Harm

Second, the litigation must have been subjectively intended to harm the defendant
through the use of the governmental process, as opposed to the outcome of that process. *See
T.F.T.F. Capital*, 312 F.3d at 93; *Shetiwy*, 980 F. Supp. 2d at 475.  In other words, the litigation
must have been brought in bad faith. *See Matsushita Elecs. Corp. v. Loral Corp.*, 974 F. Supp.
345, 355 (S.D.N.Y. 1997).  The Indictment amply alleges that Ceglia's civil lawsuit against
Zuckerberg and Facebook was brought in bad faith and was intended to harm Zuckerberg and
Facebook through use of the judicial process.  For instance, the Indictment alleges that the
lawsuit was an integral part of a multi-billion dollar scheme to defraud Zuckerberg and
Facebook. (*See* Doc. 10 ¶¶ 4, 6.)

Because the Indictment alleges that Ceglia initiated sham litigation that was objectively
baseless, subjectively intended to harm Facebook and Zuckerberg, and not protected by the
*Noerr-Pennington* doctrine, Ceglia's Motion to Dismiss on First Amendment Grounds must be
denied.

### IV.    Interlocutory Appeal and Stay

At the conference on January 30, 2015, counsel suggested that, if I denied the Motion,
Ceglia might move to stay the proceedings pending an interlocutory appeal of my decision.  If
Ceglia files an interlocutory appeal of this Order, the Second Circuit will determine for itself
whether it has jurisdiction over that appeal.  As I made clear during the conference, with the
exception of motions in limine, if the parties wish to make additional pre-trial motions, they must
first file pre-motion letters of no more than three pages with letters in opposition due three
business days after the initial letter.  Because it is my current view that this Order cannot be

16

appealed on an interlocutory basis, a motion seeking a stay of this case would likely be denied.
However, a motion for a stay is not before me and I need not decide that issue now. I do note,
however, that trial has already been delayed from November 2014 to May 2015 at Ceglia's
request to accommodate his change of counsel. (*See* Doc. 87 at 7:10-11:20.) Ceglia's Motion to
Dismiss has now received a full hearing on the merits by two different District Judges. It is time
for this case to proceed to trial.

## V.    Conclusion

For the foregoing reasons, Ceglia's Motion to Dismiss on First Amendment Grounds is

DENIED. The Clerk of Court is respectfully directed to terminate the pending motion. (Doc.

111.)

SO ORDERED.

Dated: February 9, 2015
        New York, New York

Vernon S. Broderick
United States District Judge

17

# EXHIBIT B

Reques or: USPISUWCzwiry



**UNITED STATES**
**POSTAL SERVICE**

Forensic Laboratory Examination Report
Forensic Laboratory Services
22433 Randolph Drive
Dulles, VA 20104-1000

September 27, 2013

Case No.1910925-MF - Lab File No. 9-109-009384(1)
Type of Examination: Questioned Documents
*Request Date(s):* 07-30-2013

C. P. Cizin .
Postal Inspector
P. O. Box 191
New York, NY 10008-0191

EXAMINATIONS:
Determine the printing process(es) utilized to produce the machine printed entries on Exhibits
Q-1-1 ("WORK FOR HIRE" CONTRACT, Page One, Barcode IS0000739359) and Q-1-': (Page
Two of "WORK FOR HIRE" CONTRACT, Barcode IS0000739359).

*Determine whether indented impressions are discernible on Exhibits Q-1-1 and Q-1-2.*

Determine whether the paper in Exhibit Q-1-1 and Exhibit Q-1-2 can be associated.

Determine whether Exhibits Q-1-1 and Q-1-2 were altered.

FINDINGS:
Based on visual and instrumental examinations, it was determined the machine printing on
Exhibits Q-1-1 and Q-1-2 was produced using toner technology (e.g., photocopier, laser printer).

Based on visual and instrumental examinations, it was determined no indented impress ons
were observed on Exhibits Q-1-1 and Q-1-2.

Based on the examination and inter-comparison of the paper in Exhibits Q-1-1 and Q-1 2, no
associations were effected due to the absence of any identifying characteristics (e.g.,
watermarks and/or encoding information).

Based on visual, instrumental and inter-comparison examinations of Exhibits Q-1-1 and Q-1-2,
the following was determined:
- The design of the font on page one (Q-1-1) of the contract is not
  *the same design as the font on page two (Q-1-2);*
- Arrangement differences were observed between the margins,
  spacing and column widths of Exhibits Q-1-1 and Q-1-2;
- The face of the paper in Exhibit Q-1-2 reacts differently than the
  face of the paper in Exhibit Q-1-1 when exposed to ultraviolet
  light;

Case No.1910925-MF - Lab File No. S-109-009384(1)                                    Page 2

- Tonal differences are present between the front and back of
  each page of Exhibits Q-1-1 and Q-1-2;
- Typographical errors were observed on Exhibits Q-1-1 and Q-1-2.

Due to the noted discrepancies, there are indications these pages may have come from  multiple sources.

No other associations or examinations were possible with Exhibits Q-1-1 and Q-1-2 due  o the condition of the documents.

REMARKS:
If testimony is required the undersigned should be notified at least three weeks prior to the scheduled trial or hearing date.

EXHIBITS:
Exhibits Q-1-1 and Q-1-2 received in this laboratory on July 30, 2013 are being returned with this report via hand carry.

John W. Cawley, III
Forensic Document Examiner, Sr.
Telephone: 703-406-7121
Fax: 703-406-7115

This is an official FLS examination report only if it contains an original signature of the forensic analyst.

AN ASCLD/LAB ACCREDITED LABORATORY SINCE JANUARY 26, 2010



# EXHIBIT C

**REPORT**

United States Secret Service
Office of Investigations
*Forensic Services Division*
*Questioned Documents*



March 11, 2015

**To:** U.S. Department of Justice –
Southern District of New York

**Case No.:** 175-865-86352
**X-Ref:** 12 Cr. 876 (VSB)

**Subject:** United States v. Ceglia

Alexander Wilson

**Type of Examination:** Ink, Toner, and Paper Analyses

Reference is made to an FSD Chain of Custody (FSD-014-F) and to a United States Postal Inspection Service barcode numbered IS0000739359, both dated February 18, 2015, and to a U.S. Department of Justice letter, dated February 17, 2015, requesting ink, toner, and paper analyses. Reference is also made to an electronic communication between Assistant United States Attorney Janis Echenberg and Document Analyst Joseph Stephens, dated March 7, 2015, discontinuing ink dating of Exhibit Q2.

1. EXHIBITS

   Q1   Two (2) page "'WORK FOR HIRE' CONTRACT" purportedly dated April 28, 2003 and labeled Q1-1 and Q1-2 for identification purposes.

   Q2   Six (6) page "StreetFax Back-End Technical Specification" document purportedly dated April, 28, 2003 and labeled Q2-1 through Q2-6 for identification purposes.

   Submitted but not analyzed:
   One staple in an envelope.

2. REQUESTS

   Determine if the writing ink(s) on Exhibits Q1 and Q2 were commercially available prior to 2003. Compare representative samples of the toner(s) on Exhibits Q1-1 and Q1-2 to determine if they are chemically indistinguishable. Compare representative samples of the paper(s) from Exhibits Q1-1 and Q1-2 to determine if they are chemically indistinguishable.

3. RESULTS OF EXAMINATION
   3.1. Ink Examination

   Physical, optical, and chemical examinations were conducted on representative samples of the writing inks on Exhibits Q1-2 and Q2. Exhibit Q1-1 was not analyzed due to limited sample containing sufficient colorant(s) necessary for comparison. It was determined that the written entries on Exhibits Q1-2 and Q2 were made using black ballpoint inks.



A complete listing of the families of chemically indistinguishable ink formulations is outlined below:

| Family | Exhibit and Description |
|---|---|
| Ink 1 (Black Ballpoint) | Q2-4 "c. A script that allows..." entry |
| | Q2-4 "PC" initials |
| | Q2-6 "Paul Ceglia" signature |
| Ink 2 (Black Ballpoint) | Q2-4 "MZ" initials |
| | Q2-6 "Mark Zuckerberg" signature |

The ink(s) from Exhibit Q1-2 were analyzed but did not contain sufficient extractable colorants necessary for comparison.

It was determined that the written entries on Exhibit Q1 were exposed to adverse environmental conditions prior to their arrival in Forensic Services Division because the entries show significant fading.

Dating of the writing inks on Exhibit Q2 was discontinued. Therefore, no conclusions were made regarding the authenticity of Exhibit Q1 and Exhibit Q2 with respect to date based on the commercial availability of the writing inks.

### 3.2. Toner Comparison

Physical examinations were conducted on the printed entries from Exhibit Q1. The printed entries from Exhibit Q1 were produced using an office machine system(s) utilizing toner technology.

Physical and chemical analyses were conducted on representative samples of the toner(s) on Exhibits Q1-1 and Q1-2. It was determined that the toner on these pages was chemically indistinguishable.

It was determined that the toner on Exhibit Q1 was exposed to adverse environmental conditions prior to its arrival in Forensic Services Division because the toner shows significant cracking.

### 3.3. Paper Comparison

Physical, optical, and chemical analyses were conducted on representative samples of the papers from Exhibits Q1-1 and Q1-2. It was determined that the papers used for these pages were chemically different.

It was determined that the papers from Exhibit Q1 were exposed to adverse environmental conditions prior to their arrival in Forensic Services Division because the papers show significant yellowing. It was also determined that the pages from Exhibit Q1 were not uniformly yellowed. Small areas on the fronts of Exhibits Q1-1 and Q1-2 and the vast majority of the backs of Exhibits Q1-1 and Q1-2 do not appear to have yellowed.

### 3.4. Additional Observations

The spacing and margins within the page layout differ between Exhibits Q1-1 and Q1-2. The font characteristics for the paragraphs also differ between Exhibits Q1-1 and Q1-2.

## 4. REMARKS

1) The results are opinions and interpretations formed using accepted scientific and professional practices.
2) Photographic negatives/digital images of the evidence are retained in Forensic Services Division.
3) Exposure to adverse environmental conditions can expedite various aging processes. Changes, such as fading, cracking, and yellowing, can occur through exposure to light and/or heat. Depending on the intensity and duration of the exposure, the time needed for these changes to occur can vary.
4) If additional evidence, such as writing instruments, toner cartridges, or paper, is obtained, further comparative examinations can be conducted.
5) Inks are "chemically indistinguishable" when the comparison of two or more ink samples by physical, optical, and chemical analyses reveals no significant, reproducible, inexplicable differences and there is significant agreement in all observable aspects of the results; it may be concluded that the ink samples are indistinguishable at that level of analysis. This does not imply that the inks are identical. The inks could not be excluded from one another.
6) The "age" of a written entry is often in question. While there are numerous peer-reviewed articles on dynamic ink dating, there is currently no procedure on its usage in this division.
7) Toners are "chemically indistinguishable" when the comparison of two or more samples by physical and chemical analyses reveals no significant, reproducible, inexplicable differences and there is significant agreement in all observable aspects of the results; it may be concluded that the toners are indistinguishable at that level of analysis. This does not imply that the samples are identical. The toners could not be excluded from one another.
8) Improvements in laboratory capabilities may facilitate further analysis of the toner to include information with respect to the toner's introduction date.
9) In the paper manufacturing process reams of paper and other paper products can be comprised of sheets from one or more rolls of paper. Differences in paper characteristics may be present in individual sheets from the same ream or product and, therefore, must be considered when assessing color, thickness, UV fluorescence, IRL, opacity, surface texture and printed material.



5. DISPOSITION OF EVIDENCE

The exhibits are being retained in the Forensic Services Division.

Examination by:

Joseph C. Stephens
Forensic Document Examiner

Approved by:

Michael H. Lashley
Special Agent in Charge

# EXHIBIT D

# PRESS RELEASES



Follow @SDNYNews

🖨 Printer Friendly

## Manhattan U.S. Attorney Announces Charges Against Online Businessman For Multi-Billion Dollar Scheme

**FOR IMMEDIATE RELEASE**

Friday, October 26, 2012

Preet Bharara, United States Attorney for the Southern District of New York, and Randall C. Till, the Inspector-in-Charge of the New York Office of the U.S. Postal Inspection Service ("USPIS"), announced today the unsealing of a Complaint charging PAUL CEGLIA with a multi-billion dollar scheme to defraud Facebook, Inc. and its Chief Executive Officer, Mark Zuckerberg. As alleged in the Complaint, CEGLIA filed a federal lawsuit falsely claiming to have been promised a 50% share in Facebook, and then doctored, fabricated, and destroyed evidence to support his false claim. CEGLIA was arrested this morning by federal agents at his home in Wellsville, New York, and will be presented at the federal courthouse in Buffalo this afternoon.

Manhattan U.S. Attorney Preet Bharara stated: "As alleged, by marching into federal court for a quick payday based on a blatant forgery, Paul Ceglia has bought himself another day in federal court for attempting a multi-billion dollar fraud against Facebook and its CEO. Ceglia's alleged conduct not only constitutes a massive fraud attempt, but also an attempted corruption of our legal system through the manufacture of false evidence. That is always intolerable. Dressing up a fraud as a lawsuit does not immunize you from prosecution."

USPIS Inspector-in-Charge Randall C. Till said: "When Mr. Ceglia allegedly decided to take advantage of Mark Zuckerberg and Facebook, he underestimated the resolve of the Postal Inspection Service to bring him to justice for illegal use of the U.S. Mail."

According to the allegations in the Complaint unsealed today in Manhattan federal court:

In April 2003, CEGLIA entered into a contract with Mark Zuckerberg, then a student at Harvard University, in which Zuckerberg agreed to perform certain programming work for CEGLIA and StreetFax.com, CEGLIA's online business. In the contract they signed in April 2003, CEGLIA agreed to pay Zuckerberg a fee for his work.

Years later, in April 2011, following an initial lawsuit in New York State court, CEGLIA, through counsel, filed a 25-page amended complaint in federal court in the Western District of New York claiming that Zuckerberg, in the April 2003 contract, had promised him at least a 50% interest in "The Face Book" project that ultimately became Facebook, Inc. In support of his claim, CEGLIA attached a copy of what he alleged to be the two-page April 28, 2003 contract between himself and Zuckerberg ("Alleged Contract"). The first page of the Alleged Contract contained language giving CEGLIA "a half interest (50%) in the software, programming language and business interests" derived from the expansion of "The Face Book" or "The Page Book." The second page of the Alleged Contract contained the signatures of CEGLIA and Zuckerberg. Also in support of his claim, CEGLIA described emails he alleged to have exchanged with Zuckerberg beween July 2003 and July 2004 via Zuckerberg's Harvard email account ("Purported Emails"). The Purported Emails reflected conversations between CEGLIA and Zuckerberg about the design and functionality of "The Face Book" website, as well as ways

to generate income from its expansion. The Purported Emails also reflected conversations in which Zuckerberg offered CEGLIA money to "repair [their] business relationship."

As alleged in the Complaint, however, CEGLIA's claim to having a contractual right to 50% of Facebook was entirely false. CEGLIA simply replaced page one of the real contract with a new page one doctored to make it appear as though Zuckerberg had agreed to provide CEGLIA with an interest in Facebook. And CEGLIA doctored, fabricated and destroyed evidence to support his false claim. The evidence demonstrating CEGLIA's lawsuit is a fraud included the following:

- A search of one of CEGLIA's hard drives uncovered a copy of the real April 28, 2003 contract, which CEGLIA had emailed to an attorney in March 2004, years before his lawsuit against Facebook and Zuckerberg ("Real Contract"). Page one of the Real Contract does not refer to Facebook in any fashion, let alone give CEGLIA a 50% interest in it.

- The spacing, columns, and margins of page one of the Alleged Contract are different from the spacing, columns, and margins of page two of the Alleged Contract. No such differences exist as between the pages of the Real Contract.

- A review of Harvard University's email servers reveals that none of the Purported Emails appears in Zuckerberg's email account as of February 2012. Further, none of the Purported Emails appears in Harvard's backup tapes for Zuckerberg's emails as they existed in October 2010, nor do any of the Purported Emails appear in Harvard's backup tapes for Zuckerberg's emails as they existed in November 2003. The emails between Zuckerberg and CEGLIA that do exist in Zuckerberg's email account do not show any discussion of Facebook and, contrary to Ceglia's claim, show that Zuckerberg was asking CEGLIA for money he was owed in 2004, not offering to give CEGLIA money.

- A forensic expert examined CEGLIA's hard drives and other electronic media and found evidence that in February 2011, CEGLIA deleted files relating to the April 2003 contract with Zuckerberg and replaced them with new files that supported his lawsuit but that were backdated to make it appear as if those the files had in fact been created in 2003 and 2004. Further, a CD Rom revealed that CEGLIA had done test runs on fabricating some of the documents, including the Purported Emails, upon which his lawsuit relied.

- Zuckerberg and another of Facebook's founders have said that the idea for Facebook did not arise until months after the April 2003 contract purportedly giving CEGLIA an interest in Facebook.

\*             \*             \*

CEGLIA, 39, of Wellsville, New York, is charged with one count of mail fraud and one count of wire fraud. Each count carries a maximum sentence of 20 years in prison.

Mr. Bharara praised the investigative efforts of USPIS.

The criminal case is being prosecuted by the Office's Complex Frauds Unit. Assistant United States Attorneys Janis Echenberg and Christopher D. Frey are in charge of the prosecution.

The charges contained in the Complaint are merely allegations and the defendant is presumed innocent unless and until proven guilty.

12-332

Tweet 0

# EXHIBIT E

1



```
 1                     UNITED STATES DISTRICT COURT
                       WESTERN DISTRICT OF NEW YORK
 2

 3     ------------------------------------------
       PAUL CEGLIA,
 4
                                   Plaintiff,
 5

 6
                      vs               Docket Number
 7                                     13-CV-256A

 8
       ERIC HOLDER, et al,,
 9
                                   Defendants.
10     ------------------------------------------

11
                       TRANSCRIPT OF ORAL ARGUMENT
12              BEFORE THE HONORABLE RICHARD J. ARCARA
                    UNITED STATES DISTRICT JUDGE
13

14
       APPEARANCES:
15

16     For the Plaintiff:        PAUL ARGENTIERI, ESQ., and
                                  ROBERT ROSS FOGG, ESQ., and
17                                JOSEPH ALIOTO, ESQ.
                                  GILL MESSINA, ESQ.
18
       For the Defendants:       MARY PAT FLEMING, ESQ.,
19                                Assistant United States Attorney

20

21     Court Reporter:           YVONNE M. GARRISON, RPR
                                  Official Court Reporter
22                                U.S.D.C., W.D.N.Y.
                                  68 Court Street
23                                Buffalo, New York 14202

24

25     Taken on May 10, 2013 at 11:01 a.m
```

```
 1   different case.  This is the case for the injunction.
 2              But if we do anything, like if we respond to the
 3   Court's order where we do the reply on May 15th, and we do that
 4   reply, is that in furtherance of our claim?  According to the
 5   government, it is.
 6              THE COURT:  Do you agree with that?
 7              MS. FLEMMING:  Your Honor, I don't agree with any of
 8   this argument, period.
 9              THE COURT:  Well, how do you respond to what he just
10   said?
11              MS. FLEMMING:  Well, Your Honor, fraud is fraud.  If
12   Mr. Ceglia's going to continue to make fraudulent --
13              THE COURT:  Come up to the microphone, please.
14              MS. FLEMMING:  The First Amendment doesn't protect
15   fraud, Your Honor.  The First Amendment does not protect
16   fraudulent activity, misleading statements.  Mr. Ceglia's not
17   only --
18              THE COURT:  He's saying --
19              MS. FLEMMING:  -- Mr. Zuckerberg.
20              THE COURT:  He says if he responds by the 15th to the
21   R and R --
22              MS. FLEMMING:  Yes.
23              THE COURT:  -- your papers, that he's going to be
24   indicted or he's going to be --
25              MS. FLEMMING:  Well, I don't know what the Southern
```

```
 1  District of New York is going to do.  There is a pending
 2  indictment.
 3             THE COURT:  I understand.
 4             MS. FLEMMING:  My -- it's my position --
 5             THE COURT:  No.  I think what he's saying is you're
 6  going to --
 7             MS. FLEMMING:  No.
 8             THE COURT:  -- bring an indictment.
 9             MS. FLEMMING:  No.  We don't have -- the Southern
10  District of New York has the pending indictment.  The Western
11  District of New York has no pending criminal matter.
12             THE COURT:  Who's going to bring this indictment
13  that -- if you file these papers on the 15th, here or in
14  New York?
15             MR. ALIOTO:  The government is threatening that if we
16  do it, we would be subject to indictment and apparently in
17  New York.
18             THE COURT:  What government, the U.S. Attorney in
19  New York or here?
20             MS. FLEMMING:  Southern District.
21             MR. ALIOTO:  No, Southern District.
22             THE COURT:  All right.
23             MR. ALIOTO:  The Southern District is invading this
24  case and trying to stop this case.  And the Southern District
25  is threatening lawyers who are representing Mr. Ceglia in this
```

```
 1  case, in the case in front of Your Honor.

 2          And we have one, -- we had one, as you probably know,

 3  Your Honor, one lawyer tried to get out because he felt like he

 4  was threatened and he didn't want to be threatened, and so he

 5  wanted to quit.  The magistrate didn't allow him to quit.  But

 6  he wrote a letter.  He was threatened.

 7          And the lawyers who are prosecuting the case against

 8  Mr. Zuckerberg and Facebook are threatened by this language

 9  that they could do that, that they're saying you're acting in

10  furtherance of this indictment.

11          THE COURT:  Where is this language you're referring

12  to?

13          MR. ALIOTO:  This is in -- this was right in the

14  beginning of the case, Your Honor, and this is from --

15          THE COURT:  What document is this?

16          MR. ALIOTO:  This is from the motion with regard to

17  the venue.  One moment, Your Honor.  It's the government's

18  memorandum of law with regard to the venue.

19          And if I might take it out and pass it up to Your

20  Honor, without the --

21          THE COURT:  Is that the only copy you have?

22          MR. ALIOTO:  Well, I have the exhibits and

23  everything.

24          THE COURT:  Wait a minute.  Do I have it?

25          MR. ALIOTO:  I'll give it to you, Your Honor.  You
```

Case 15-628, Document 20-2, 03/23/2015, 1467522, Page38 of 47

 1 | can have it.  We'll get one some other place.
 2 |           THE COURT:  Wait a minute.  Do I have it here?  I
 3 | don't know if I have it.
 4 |           MR. ALIOTO:  This is the paper, Your Honor.  I have
 5 | it marked on the page where it is, Your Honor.
 6 |           THE COURT:  Just a second.  Well, it doesn't mention
 7 | Western New York -- or --
 8 |           MR. ALIOTO:  That's the government's paper, Your
 9 | Honor.
10 |           THE COURT:  Yeah.  It says, "In using this civil
11 | action --" that's this one?
12 |           MR. ALIOTO:  Yes.
13 |           THE COURT:  " -- defrauds and demands a significant
14 | ownership stake in Facebook, Inc., Ceglia has caused various
15 | legal documents, including motions and declarations --"
16 |           MR. ALIOTO:  That's by the lawyers.
17 |           THE COURT:  "-- to be transmitted, both by mail and
18 | by e-mail, from the Southern District of New York, among other
19 | places, to counsel for the civil defendants located in, among
20 | other places, Washington, D.C.  Similarly, at various times,
21 | Ceglia's attorneys, located in California and Ohio, have
22 | transmitted legal documents, in furtherance of the defendant's
23 | fraudulent scheme, via e-mail to counsel for civil defendants
24 | in Manhattan."
25 |           MR. ALIOTO:  So chose -- that's in reference --

1              THE COURT:  Is that part of the record that I have
2       here?
3              MR. ALIOTO:  Yes, Your Honor.
4              THE COURT:  It is?  Well, it must be.
5              MR. FOGG:  It was filed under the original TRO, Your
6       Honor.
7              THE COURT:  Pardon me?
8              MR. FOGG:  That would be filed under -
9              THE COURT:  It's attached with the original TRO?
10             MR. FOGG:  Yes, Your Honor.
11             THE COURT:  All right.
12             MR. ALIOTO:  So, if it please the Court, the
13      attorneys, in order to get discovery, in order to prosecute the
14      case, if we had - I mean, ordinarily, what we would seek to do
15      is try to get a trial date, even as early as this fall.
16             But it seems that this invasion, really, into your --
17      into the case before Your Honor, is that any lawyer who tries
18      to do that or the plaintiff who tries to do that, and tries to
19      promote the prosecution of the case, seeking regular discovery,
20      seeking the discovery of Mr. Zuckerberg or the like --
21      remember, we sought the discovery in this injunction.  Okay.
22      If we tried it in the other case we are concerned that we would
23      be, according to the government, acting in furtherance of a
24      scheme to defraud.
25             Now, we've shown that it's not a scheme to defraud in

# EXHIBIT F

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4                  v.                         12 CR 876 (ALC)

 5   PAUL CEGLIA,

 6                  Defendant.

 7   ------------------------------x

 8                                            New York, N.Y.
                                             March 7, 2014
 9                                           11:15 a.m.

10
     Before:
11
                     HON. ANDREW L. CARTER, Jr.,
12
                                             District Judge
13

14                            APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     CHRISTOPHER D. FREY
17        Assistant United States Attorney

18   DAVID E. PATTON
     ANNALISA MIRON
19        Attorneys for Defendant

20

21

22

23

24

25

1   defendants' schemes to defraud at least initially included the

2   mailing or transmission of fraudulent documents in a

3   nonlitigation context.

4           In his reply briefs, Ceglia argues that the judicial

5   function exception to the False Statements Act, 18 U.S.C.

6   Section 1001, applies to mail and wire fraud.  Congress

7   specifically codified that exception in the False Statements

8   Act, and I have found no authority, nor has Ceglia cited any,

9   extending its application to other fraud statutes, specifically

10  mail and wire fraud.

11          Second, Ceglia argues that he could have no "intent to

12  deceive" when Zuckerberg was aware of Ceglia's

13  misrepresentations and could not possibly be deceived by them.

14  Ceglia supports this proposition with Norton v. United States,

15  92 F.2d 753 (9th Cir. 1937) and Pendergraft out of the Eleventh

16  Circuit.  While those cases are interesting and persuasive,

17  they are not binding on this Court.

18          The government argues that even if Zuckerberg could

19  not have been deceived, Facebook certainly could have.

20  Pendergraft forecloses that argument, but it's not binding on

21  this Court.

22          Next, the government suggests that Ceglia intended to

23  deceive the judge and jury in his allegedly fraudulent action.

24  I haven't found any cases sustaining a mail and wire fraud

25  conviction for attempting to deceive a judge or a jury.

# EXHIBIT G

1

EanQcegC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   UNITED STATES OF AMERICA
3
                v.                          12 CR 876 (ALC)
4
   PAUL CEGLIA
5
                    Defendant
6  ------------------------------x

7                                           New York, N.Y.
                                            October 23, 2014
8                                           10:30 a.m.

9
   Before:
10
                    HON. ANDREW L. CARTER, JR.
11                                          District Judge

12
                            APPEARANCES
13
   PREET BHARARA
14     United States Attorney for the
       Southern District of New York
15  JANIS ECHENBERG
    NIKETH VELAMOOR
16     Assistant United States Attorney

17  LAW OFFICE OF ROBERT R. FOGG
       Attorneys for Defendant
18
    ROBERT R. FOGG
19  GIL MESSINA
    TIMOTHY MAY
20

21

22

23

24

25

EanQcegC

1     has sued DL Piper. That's one of the law offices. That's one

2     information. They should be here. They should have a right to

3     say. And this court shouldn't turn that information over

4     because it will be prejudicial to their case as well.

5            Your Honor, what they point to in their case, they got

6     the indictment, they got a complaint, a decision from two

7     judges in Buffalo. They say those things to establish probable

8     cause, but they haven't forwarded any probable cause at all,

9     none.

10           By virtue of the fact that those issues were already

11     decided, Judge, three judges have already made a decision, how

12     could you go against three judges? Allowing this information,

13     Judge, you are going to have to make an issue as to the triable

14     issue of this case. They are saying the contract is a fraud.

15     Your Honor, you are going to have to decide whether this

16     contract is a fraud before we even get to a trial. And if

17     Mr. Ceglia is cloaked in the presumption of innocence, then we

18     are just stripping that away from him.

19           THE COURT: Why is it you say that I have to determine

20     whether or not this contract is fraudulent? And by what

21     standard are you talking about? You keep talking about triable

22     issues of fact. It seems to me that you are wanting me to make

23     some sort of pretrial determination beyond a reasonable doubt

24     or beyond any sort of doubt that this is -- I am not going to

25     be the ultimate trier of fact of this matter. The issue is

EanQcegC

1   probable cause. You have experts who say one thing about that

2   contract. The government has experts who will say something

3   else. You say this is a triable issue of fact. I agree, it is

4   a triable issue of fact, a triable issue of fact really doesn't

5   mean a whole lot in the criminal context.

6          In the civil context, that could mean it would be

7   inappropriate to impose some sort of summary judgment but that

8   has nothing to do with whether there is probable cause. The

9   standard here is probable cause, whether or not there is

10  probable cause to believe that a fraud has been committed. I

11  understand your position is that a fraud has not been

12  committed, and that the contract is genuine, and that is

13  something that it seems to me ultimately needs to be decided by

14  a jury, by a standard of beyond a reasonable doubt. It seems

15  that you are inviting me to make the ultimate determination in

16  this case, which is inappropriate for me to do, and it's not my

17  real.

18         My role at this point in terms of dealing with this

19  crime fraud exception is just to determine whether or not based

20  on the information before me, there is probable cause to

21  believe that a crime has been committed as a result of this,

22  and, particularly, a fraudulent crime, wire fraud, mail fraud

23  and the like, by the government's theory is that the initiation

24  of this entire lawsuit was fraudulent.

25         Obviously you disagree with that, but it seems to me

EanQcegC

1   that at a minimum -- well, you won't concede -- but at a

2   minimum it seems to me that I am not sure how you can dispute

3   that at a minimum there is probable cause regarding the

4   contract regarding this issuance of the contract.

5           I know you believe that the contract is genuine. You

6   have experts who believe that the contract is genuine and the

7   jury will decide -- let me rephrase this. The jury will not

8   decide whether or not the contract is actually genuine. The

9   jury will decide whether or not the government has proven its

10   case beyond a reasonable doubt.

11           But I want to hear more from you as to why there is

12   not probable cause, which is a much lower standard than what it

13   seems to me that you are inviting me to apply here.

14           MR. FOGG: Well, Judge, I do not invite, I do not

15   attempt, nor do I in any way try to suggest that I am asking

16   this Court to invade the province of some jury that will decide

17   the issue beyond a reasonable doubt. That is not what I am

18   doing.

19           What I am simply saying is in order to get to the

20   standard which was set by *In Re: Richard Roe*, and that standard

21   is clear that the litigation or any aspect thereof had little,

22   even no legal or factual basis, the litigation itself. So,

23   therefore, they would have to establish that Mr. Ceglia when he

24   initiated his civil lawsuit -- now this is the probable cause

25   burden -- *In Re: Richard Roe*, they have to establish that it